UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
METRO-GEM LEASING & FUNDING CORP.,

                Plaintiff,

        -against-                          16-CV-5245 (SJF)(AYS)

MACKY DANCY; TYRONE HILL; DANCY AUTO          **OPINION and ORDER**
GROUP LLC; DANCY AUTO GROUP OF GREAT
NECK LLC; KASSEM [sic] DEAN; KASSEM [sic]
DEAN, a/k/a SWIZZ BEATZ; SWIZZ BEATZ
PRODUCTIONS, INC.; AK WORLDWIDE
PRODUCTIONS, INC.; JOHN WILLIAMS, III; GREAT
NECK AUTO SALES, LLC; and JOHN DOES # 1-10,

                Defendants.
----------------------------------------------------------------------X

FEUERSTEIN, District Judge:

    On or about September 21, 2016, plaintiff Metro-Gem Leasing & Funding Corp.

("plaintiff" or "Metro-Gem"), commenced this action against defendants Macky Dancy

("Dancy"), Dancy Auto Group LLC ("DAG"), and Dancy Auto Group of Great Neck, LLC

("DAGGN") (collectively, "the Dancy defendants"); defendants Kasseem Dean ("Dean"), i/s/a

Kassem Dean and Kassem Dean, a/k/a Swizz Beatz, and Swizz Beatz Productions, Inc. ("SBP")

(collectively, "the Dean defendants"); defendant AK Worldwide Productions, Inc. ("AKW"); and

defendants Tyrone Hill ("Hill"), John Williams, III ("Williams") and "John Does # 1-10"

(collectively, "the defaulting defendants"), alleging, *inter alia*, violations of the Racketeer

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, *et seq*.  On December

1, 2016, after the Dean defendants had served a motion to dismiss plaintiff's claims against them

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, plaintiff filed an amended

complaint asserting claims seeking, *inter alia*, (1) damages (a) against Dancy and Hill, the Dean defendants and Williams for RICO violations (first, second and third causes of action, respectively), (b) against the Dancy defendants and Hill for breach of fiduciary duty (fourth cause of action), (c) against Dancy for conversion, tortious interference with contract, negligent misrepresentation and fraud (fifth, sixth, seventh and eighth causes of action, respectively), and (d) against the Dean defendants, AKW and Williams for breach of contract (ninth cause of action); (2) the imposition of a constructive trust over certain assets or property in the possession of Dancy, the Dean defendants and Williams (tenth cause of action); and (3) an order of replevin or attachment against all defendants (eleventh cause of action).  By order dated December 8, 2016, *inter alia*, the Court granted the Dean defendants' application to deem their previously served motion to dismiss to be addressed to the amended complaint.  Pending before the Court are the motions of the Dean defendants and AKW to dismiss plaintiff's claims against them in their entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief.  For the reasons set forth below, the Dean defendants' and AKW's motions are granted to the extent set forth herein.

I.      BACKGROUND

   A.      Factual Background[1]

_____

[1]  The factual allegations in the amended complaint are assumed to be true for purposes of this motion, "unless contradicted by more specific allegations or documentary evidence," *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011), and do not constitute findings of fact by the Court.  Only those allegations designated in the amended complaint as being "common to all RICO Counts," (Am. Compl. at 4-9), and those allegations pertaining specifically to the Dean defendants and AKW, are set forth herein since the remaining defendants have not moved to dismiss plaintiff's claims against them.

1.    The Parties

Plaintiff is a New York corporation "in the business of funding the acquisition of various high end motor vehicles for leasing on the sub-prime market." (Amended Complaint ["Am. Compl."], ¶¶ 4-5). Gary Denner ("Denner") is the president and a principal of plaintiff and Mitchell Kaminsky ("Kaminsky") is also a principal of plaintiff. (*Id.*, ¶¶ 25, 124).

DAG is a New York limited liability company that was dissolved on September 4, 2015. (Am. Compl., at 2, n. 1 and ¶ 9). DAGGN is a New York limited liability company maintaining an address at 105 Northern Boulevard, Great Neck, New York, which is the same address that was maintained by DAG prior to its dissolution. (*Id.*, ¶¶ 9-10). Dancy and Hill were "the principle [sic] majority owners and operators" of DAG, and are the principal owners and operators of DAGGN. (*Id.*, ¶¶ 11, 120). Plaintiff alleges that Dancy and Hill "have co-managed such motor vehicle dealerships licensed by the State of New York, Department of Motor Vehicles - and have engaged in the principal business of buying, selling and leasing motor vehicles manufactured by various automobile companies." (*Id.*, ¶ 12).

Plaintiff alleges, upon information and belief, that GNAS is a New York limited liability company maintaining the same address as DAGGN, and is "a new entity created by . . . [Dancy and Hill] - intended in part to serve as a beneficiary of fraudulently conveyed assets originating from and transferred by [DAG and DAGGN]." (Am. Compl., ¶¶ 21-22; *see also Id.*, ¶¶ 119-120). Plaintiff further alleges that DAG, DAGGN and GNAS (collectively, "the Companies") "are enterprise(s) engaged in acquisition and distribution of motor vehicles and services related thereto and those activities affect interstate commerce[,]" (*id.*, ¶ 118); and that Dancy and Hill conducted the predicate acts alleged in the amended complaint through the Companies "and

3

accordingly those entities serve as the enterprise in accordance with 18 USC [sic] § 1961(4)." (*Id.*, ¶ 138).

Dean "is a notable hip hop recording artist and music producer," who uses the assumed "stage name," "Swizz Beatz." (Am. Compl., ¶ 15). Plaintiff alleges, upon information and belief, that Dean is the sole owner and operator of SBP, a New York corporation. (*Id.*, ¶¶ 16-17).

Plaintiff alleges, upon information and belief, that AKW is a New York corporation that is owned and operated by Dean's wife. (Am. Compl., ¶¶ 18-19).

Plaintiff identifies the "John Doe" defendants as "other present but unidentifiable straw companies or individuals who have received assets and/or compensation arising out of the alleged activities of the defendant . . . [and] which may, in fact be complicit with the . . . [named] defendants[.]" (Am. Compl., ¶¶ 23-24).

### 2.     Allegations Related to the Funding of Leases

In March 2012, Denner and Kaminsky "agreed to fund various sub-prime motor vehicle leases pursuant to deal by deal requests by . . . [Dancy and Hill] - utilizing their original two companies - [DAG and DAGGN]." (Am. Compl., ¶ 25) (footnote omitted). According to plaintiff, Dancy "typically" would call it "and advise that he had secured an individual/customer who was interested in leasing a specific motor vehicle." (*Id.*, ¶ 26). Plaintiff "would then review the particular motor vehicle specifications together with the proposed lease contract upon receipt from [Dancy] - who both [sic] the U.S. mail and Internet to transmit said documentation." (*Id.*, ¶ 27). "If the terms were acceptable, [plaintiff] would fund the lease by depositing monies with [Dancy] in order to cover for the purchase of such motor vehicle." (*Id.*, ¶ 28). According to

plaintiff, Dancy, "[a]cting as a registered New York State vehicle dealer, . . . would ostensibly serve as a broker/agent for both [plaintiff] and the prospective resulting lessee[,]" (*id.*, ¶ 29); and would "secure his compensation in the form of a commission - at lease inception." (*Id.*, ¶ 30).

"Following consummation of a lease, [Dancy] would dispatch the main page of said lease along with the registration documents via Internet and thereafter would ordinarily mail the complete document containing the signatory pages." (Am. Compl., ¶ 32). "Pursuant to the parties [sic] agreement and developed custom, [Dancy] would identify [plaintiff] in the lease contract(s) as the 'lessor' and would in turn issue a motor vehicle title certificate to [plaintiff] designating them [sic] as the appropriate owner." (*Id.*, ¶ 31). According to plaintiff, "in the automobile leasing business, finance companies like [plaintiff] could often wait several months - from lease inception - until the point came where it received a funded vehicle's title certificate." (*Id.*, ¶ 35). Consequently, plaintiff "was required to rely on the soundness of the initializing lease documentation, including the vehicle's registration and related documents (i.e [sic] insurance certificate)." (*Id.*, ¶ 36). According to plaintiff, "upon receiving such documentation, [it] would have no cause to suspect any shortcomings." (*Id.*, ¶ 37).

"Payments to [plaintiff] under the contemplated leases would ordinarily be paid monthly by [Dancy] himself - who first presumably collected such monies from the lessees themselves." (Am. Compl., ¶ 33). According to plaintiff, Dancy designed that "methodology," which "enabled him to later subvert certain deals by providing a false impression that the leases were otherwise legitimate and current." (*Id.*, ¶ 34). However, plaintiff also alleges that at some unidentified point in time, Dancy and Hill "conspired with certain lessees and in part had them redirect their monthly lease payments to themselves, rather than [plaintiff], and upon information and belief -

altered pre-existing lease contracts by substituting themselves as the 'lessor[,]'" (*id.*, ¶ 50; *see also id.*, ¶ 139), thereby enabling Dancy "to later collect vehicles themselves [sic], all while frustrating [plaintiff's] legal recourse rights." (*Id.*, ¶ 51).

From the Spring of 2012 through the Spring of 2015, plaintiff funded twenty-seven (27) motor vehicles that were leased to various individuals, (Am. Compl., ¶ 38), and were subsequently registered and titled in various states, including New York, New Jersey, Pennsylvania, Tennessee and Texas. (*Id.*, ¶ 57). Plaintiff alleges: (a) that unbeknownst to it, Dancy and Hill "began operating a racketeering enterprise under the veil of [DAG and DAGGN] - staged to specifically defraud [it] - by misrepresenting lease and registration documents and by converting (or attempting to convert) their vehicles and lease payments as well as by disrupting [plaintiff's] recourse rights[,]" (*id.*, ¶ 39; *see also id.*, ¶¶ 121-122); (b) that Dancy and Hill "conspired with at least two different lessees - with a preconceived plan to further defraud [it]" (*id.*, ¶ 40); and that "specific predicate acts were undertaken between 2013 and 2015 which included, amongst other things, manipulation/misrepresentations of: lease contracts, vehicle registrations, vehicle dealer logs/DMV registry(s), inventory floor plans, vehicle title certificates and other related documentation." (*Id.*, ¶ 41). According to plaintiff, it did not discover "that these defendants had engaged in widespread fraud against them [sic]," (*id.*, ¶ 42), or "the extent of [Dancy's] tortious misconduct - which included (in addition to the leased vehicles funded by [plaintiff]) - fraudulent concealment of its [sic] dealership's asset values as well as an undisclosed lawsuit brought by TD Bank (whom they [sic] had contracted with to enable customer financing for retail purchases of other additional motor vehicles)[,]" until July 2015. (*Id.*, ¶ 60) (footnote omitted).

Plaintiff alleges that Dancy and Hill "undertook a variety of fraudulent acts [relating to the funding of leases] and on one specific occasion - issued a bogus registration under the specter of a bona fide lease, all while surreptitiously conveying away a 2014 Ferrari F12 (which [plaintiff] had paid for) - to a third-party." (Am. Compl., ¶ 49 [italics omitted]; *see also Id.*, ¶ 56). Specifically, plaintiff alleges that Dancy and Hill intentionally "fail[ed] to file a registration and subsequently fail[ed] to transfer ownership to [plaintiff] regarding it's [sic] funding of a lease to a 2014 Ferrari F 12[;]" that "[a]s part of th[at] scheme to avert [sic] issuing title in the name of [plaintiff], they deceptively advanced monthly lease payments with the intention provide [sic] a false impression that the vehicle was otherwise duly leased and registered to [SBP][;]" and that it "later discovered," as set forth below, that Dean "conspired with [Dancy and Hill] and gave the car to them to covertly resell." (*Id.*, ¶ 123(a)) (italics omitted).

Plaintiff alleges that on or about January 30, 2013, Dancy contacted it "and excitedly discussed that his long time friend, [Dean], would be interested in leasing several exclusive automobiles - for use by himself and his wife, . . . ." (Am. Compl., ¶ 61). On February 1, 2013, plaintiff "agreed to initially fund the purchase and lease of a 2012 Karma Fisker - the cost of which was approximately $98,000.00." (*Id.*, ¶ 62) (italics omitted). According to plaintiff, "[t]he ensuing lease was issued to . . . [SBP] for a term of 42 months having a monthly rate of $1,794.00[,]" (*id.*, ¶ 63); and the vehicle was "paid in accordance with the contract terms until April, 2014 - at which point in time it was traded in by [Dean] for a lease of another vehicle - a Mercedes-Benz 'G Wagon'." (*Id.*, ¶ 64) (italics omitted).

On April 25, 2013, plaintiff "agreed to fund the purchase and lease of a 2013 McLaren Spyder - the cost of which was approximately $337,000.00." (Am. Compl., ¶ 65) (italics

7

omitted).  According to plaintiff, "[t]he ensuing lease was issued to . . . [SBP] for a term of 36 months having a monthly rate of $2,184.14[,]" (*id.*, ¶ 66); and the vehicle was "paid in accordance with the contract terms until September, 2013 - at which point in time it was traded in by [Dean] for a lease of another vehicle - a 2012 Lamborghini Aventador."  (*Id.*, ¶ 67) (italics omitted).

On June 15, 2013, plaintiff "agreed to fund the purchase and lease of a 2013 Land Rover/Range Rover Supercharged - the cost of which was approximately $155,000.00."  (Am. Compl., ¶ 68) (italics omitted).  According to plaintiff, "[t]he ensuing lease was issued to . . . [AKW] for a term of 39 months having a monthly rate of $1,741.00[,]" (*id.*, ¶ 69); and the vehicle was "paid until June, 2016 - at which point in time it . . . went into default."  (*Id.*, ¶ 70) (italics omitted).

On or about October 30, 2013, plaintiff "agreed to fund the purchase and lease of a 2012 Lamborghini Aventador - the cost of which was approximately $412,213.48."  (Am. Compl., ¶ 71) (italics omitted).  According to plaintiff, "[t]he ensuing lease was issued to . . . [SBP] for a term of 60 months having a monthly rate of $6,988.00[,]" (*id.*, ¶ 72); and the vehicle was "paid in accordance with the contract terms until December, 2014 - at which point in time it was traded in by [Dean] for a lease of another vehicle - . . . [a] 2014 Ferrari F 12."  (*Id.*, ¶ 73) (italics omitted).

On or about February 15, 2014, plaintiff "agreed to fund the purchase and lease of a 2014 Mercedes-Benz G Wagon 550 - the cost of which was approximately $143,000.00."  (Am. Compl., ¶ 74) (italics omitted).  According to plaintiff, "[t]he ensuing lease was issued to . . . [SBP] for a term of 48 months having a monthly rate of $1,699.00[,]" (*id.*, ¶ 75); and the vehicle was "paid until March, 2016 - at which point in time it too curiously went into default."  (*Id.*, ¶

76) (italics omitted).

On June 15, 2014, plaintiff "agreed to fund the purchase and lease of a 2014 Rolls Royce Wraith Coupe - the cost of which was approximately $345,000.00."  (Am. Compl., ¶ 81) (italics omitted).  According to plaintiff, "[t]he ensuing lease was issued to . . . [SBP] for a term of 48 months having a monthly rate of $5,874.78[,]" (*id.*, ¶ 82); and the vehicle was "paid in accordance with the contract terms until June, 2015 - at which point in time it was traded in by [Dean] for a lease of another vehicle - a 2015 Bentley Continental GT Convertible."  (*Id.*, ¶ 83) (italics omitted).

On or about December 13, 2014, Dancy called Denner "in order to discuss purchasing [the 2014 Ferrari F 12] with a view to executing a lease to [Dean]," (Am. Compl., ¶ 124); Dancy and Hill "prepared documents to memorialize the contemplated transaction and transmitted the lease cover, registration and supporting documents via Internet to [plaintiff]," (*id.*, ¶ 125); and in reliance on those documents, plaintiff "agreed to fund the purchase and lease of a 2014 Ferrari F 12 - the cost of which was approximately $484,000.00," (*id.*, ¶ 84) (italics omitted), and delivered four hundred eighty-four thousand dollars ($484,000.00) to Dancy and Hill therefor. (*Id.*, ¶ 126).  Plaintiff alleges: (a) that it "expected a bona fide lease with [Dean's] company - [SBP] - for a 60 month term at the monthly lease rate of $6,988.00[,]" (*id.*, ¶ 127; *see also id.*, ¶ 85); (b) that "[s]hortly after funding and start of the lease, [Dancy and Hill] surreptitiously withdrew the motor vehicle registration documents - without ever advising [plaintiff]," (*id.*, ¶ 130); (c) that Dancy and Hill "ensured that the lease was paid in accordance with the contract terms for approximately six months[,]" (*id.*, ¶ 128), *i.e.*, until July 2015, "at which point in time the lease otherwise went into default[,]" (*id.*, ¶ 86); and (d) that "[b]y advancing monthly

payments to [plaintiff] until July, 2015, [Dancy and Hill] intentionally provided a false impression that a bona fide lease was in place and that the subject vehicle was properly registered."  (*Id.*, ¶ 131).  According to plaintiff, "without any suspicion especially given the customary delay in receiving title certificates - [Dancy and Hill] swiftly acted within their corrupt 'window of opportunity' and effectuated said sale of the [2014 Ferrari F 12]," (*id.*, ¶ 132), and consequently, plaintiff "cannot exercise its recourse remedies pursuant to their lease terms - particularly repossession of the vehicle."  (*Id.*, ¶ 133).

On June 1, 2015, plaintiff "agreed to fund the purchase and lease of a 2015 McLaren Spider - the cost of which was approximately $389,000.00."  (Am. Compl., ¶ 95) (italics omitted).  According to plaintiff, "[t]he ensuing lease was issued to . . . [SBP] for a term of 60 months having a monthly rate of $6,069.18[,]" (*id.*, ¶ 96); and the vehicle was "paid until June, 2016 until it too went into default."  (*Id.*, ¶ 97).  On that same date, plaintiff also "agreed to fund the purchase and lease of a 2015 Bentley Continental GT Convertible - the cost of which was approximately $275,000.00."  (Am. Compl., ¶ 99) (italics omitted).  According to plaintiff, "[t]he ensuing lease was issued to . . . [SBP] for a term of 60 months having a monthly rate of $3,999.00[,]" (*id.*, ¶ 100); and the vehicle was "paid until June, 2016 - at which point in time it too went into default."  (*Id.*, ¶ 101) (italics omitted).

Plaintiff alleges that it "learned later in 2015 that [Dancy, Hill] and [Dean] conspired to secretly sell the 2014 Ferrari F 12 to a third-party buyer[,]" (Am. Compl., ¶ 87 [italics omitted]; *see also id.*, ¶ 129); that when plaintiff confronted Dean, he "conceded that he did, in fact, take possession of the subject vehicle and accepted the aforementioned lease and in turn operated same for 'at least one month[,]'" (*id.*, ¶ 88); and that "at some point in time after lease inception,

10

[Dean] gave the vehicle back to [Dancy]."  (*Id.*, ¶ 92).

Plaintiff alleges, upon information and belief, (a) that "early in 2016," Dancy conspired with Dean (i) "so as to have [Dean] deliver the [2014 Mercedes-Benz G Wagon 550] to [Dancy] - without any approval or release by [plaintiff][,]" in order "to enable [Dancy and Hill] to surreptitiously attempt to resell or re-lease same to a third-party - irrespective of the rights of [plaintiff][,]" (*id.*, ¶¶ 77-78; *see also id.*, ¶ 123(b)), (ii) "in order to divert any inquiries by [plaintiff] and attempt to avoid any responsibility including repossession efforts it was otherwise legally obligated to[,]" (*id.*, ¶ 98), and (iii) "in order to avert [sic] [plaintiff's] recourse rights and to hide its vehicles[,]" (*id.*, ¶ 102); and (b) that Dean knew that it "was the true rightful owner of its leased vehicles yet nonetheless conspired with [Dancy] to disrupt their [sic] interests."  (*Id.*, ¶ 103).  Plaintiff further alleges (a) that Dancy and Dean (i) "hid" the 2014 Mercedes-Benz G Wagon 550 "during that time", *i.e.*, in early 2016, without making any further lease payments, in order to avoid "recourse rights" and repossession efforts, (*id.*, ¶¶ 79 and 123(b)), and (b) effectively avoided repossession "for several months - until [the vehicle] was eventually discovered and repossessed from [Dancy's] home on or about August 20, 2016[,]" (*id.*, ¶ 79); and (b) that "the 2014 Mercedes-Benz G Wagon 500 was used in an unauthorized fashion and its illegal transfer interstate was in violation of 18 USC [sic] §§ 2321 and/or 2312, 2313."  (*Id.*, ¶¶ 80 and 123(b); *see also Id.*, ¶ 154).

Denner, as the corporate owner of plaintiff, filed a complaint relating to the 2014 Ferrari F 12 against DAGGN with the New York State Department of Motor Vehicles ("DMV"), which "undertook a comprehensive investigation and thereafter conducted a hearing on June 21, 2016" pursuant to Section 415, 417 and 420 of the New York Vehicle and Traffic Law.  (Am. Compl.,

¶¶ 89-90; Declaration of Mather B. West ["West Decl."], Ex. B).  According to plaintiff,

DAGGN and Hill "answered to allegations of misconduct and to charges under the NYS Vehicle

and Traffic Law § 415-9 et. seq. (committing fraud or fraudulent practices as a registered

automobile dealer)." (*Id.*, ¶ 90).  The administrative law judge ("ALJ") found, *inter alia*, (1) that

"the confidential relationship" that had developed between plaintiff and DAGGN over an

approximate five (5)-year period led Denner "to forego conventional formalities such as securing

legal title before leasing a vehicle[,]" (West Decl., Ex. B at 2); (2) that "[w]ithin a few days after

the lease contract [between plaintiff and SBP for the 2014 Ferrari F 12] was signed on December

20, 2014, [DAGGN] cancelled the registration before the leasing documentation was recorded, so

that the transaction never appeared on [DMV] records[,]" (*id.*; *see also* Am. Compl., ¶ 91); (3)

that DAGGN's "book of registry shows that the plates issues on December 29, 2014 . . . were

listed as lost plates with no vehicle or insurer information[,] . . . [and] that the subject vehicle

was sold to Manhattan Motor Cars on January 29, 2015[,]" which then sold it "to a California

company on January 29, 2015[,]" (West Decl., Ex. B at 2); (4) that "the monthly lease payments

were timely made up until July 1, 2015[,] . . . [for] the purpose of . . . lull[ing] [Denner] into a

false sense of security[,]" (*id.*); (5) that Denner "did not realize that he had been defrauded until

the payments stopped[,]" (*id.* at 2-3); and (6) that DAGGN (a) "committed a fraud or a fraudulent

practice by selling a vehicle to [plaintiff] as per agreement and failed [sic] to transfer ownership

as required[,]" (*id.* at 3; *see also* Am. Compl., ¶ 91), (b) "fraudulently and deceptively produced a

registration, later cancelling it so that the transaction [was] not submitted to the [DMV]," in

violation of the New York Vehicle and Traffic Law, (West Decl., Ex. B at 3); (c) "issued [a] NY

registration plate . . . to the subject vehicle to be registered in the name of [SBP], then marked the

plate log as lost and failed to record the date the application was submitted," in violation of the Commissioner's regulations, and "failed to notify police and the [DMV] that the said plate was lost[,]" (*id.*), and (d) "failed to properly maintain book of registry by failing to record the transaction for the subject vehicle with [plaintiff] for the purchase of the vehicle and only recorded the sale of the vehicle to Manhattan Motor Cars, against regulations." (*Id.*; *see also* Am. Compl., ¶ 93). The ALJ imposed a civil penalty against DAGGN in the total amount of three hundred seventy-five thousand four hundred thirty-two dollars and forty cents ($375,432.40) and revoked DAGGN's dealership registration for its "misconduct in perpetrating an outrageously fraudulent scheme." (West Decl., Ex. B at 4; *see also* Am. Compl., ¶ 94).

Plaintiff alleges that as of August 2016, there were four (4) vehicle leases, in addition to the 2014 Ferrari F 12, in which the Dean defendants and AKW "served as lessees" that were still in default, to wit, the leases for the 2015 McLaren Spider, the 2015 Bentley Continental GT Convertible, the 2014 Mercedes-Benz G Wagon 550 and the 2013 Land Rover/Range Rover Supercharged. (Am. Compl., ¶ 104; *see also Id.*, ¶ 155).

### 3. Allegations Relating to the Loan Agreement

Plaintiff alleges that "[i]n addition to funding leases and purchasing automobiles, [it] also financed the [DAG and DAGGN] dealerships themselves - pursuant to a comprehensive loan agreement executed in January, 2014 ['the Loan Agreement'] - which had memorialized a loan of $4,000,000.00." (Am. Compl., ¶ 43). According to plaintiff, "the loan was paid in accordance with its terms through July, 2015 - at which point in time [Dancy, Hill, DAG and DAGGN] (together with other loan signatories) - defaulted[,]" (*id.*, ¶ 44), and then plaintiff "discovered that

13

[Dancy] had falsified floor-plan vehicle reporting documents relative to the assets they [sic] maintained at their [sic] dealerships - a necessary prerequisite pursuant to the [Loan Agreement]."  (*Id.*, ¶ 45).

According to plaintiff, pursuant to the Loan Agreement, it "held the majority of [Dancy's] vehicle titles in the form of 'open vehicle title certificates' - in order to secure same until a point-of-sale took place[,]" (Am. Compl., ¶ 46), but upon the default of the Loan Agreement, it "discovered that at least six motor vehicles (all high-value Land Rover/Range Rovers) - had been deceptively shipped and sold overseas by [Dancy] who, upon information and belief, issued bogus duplicate title certificates[]."  (*Id.*, ¶ 47) (footnote omitted).  Several of those Land Rovers "reappeared in the United States within months after being shipped to China for resale here." (*Id.*, ¶ 48).

In October 2015, plaintiff commenced an action against DAG, DAGGN, Dancy, Hill and John Carey in the Supreme Court of the State of New York, County of Nassau, *Metro-Gem Leasing & Funding Corp. v. Dancy Auto Grp. LLC*, No. 606783/2015, "[a]s a consequence of the loan default" ("the state court action").  (Am. Compl. at 7, n. 5).  On May 31, 2016, judgment was entered in plaintiff's favor in the state court action in the total sum of three million eight hundred eighty-seven thousand eight hundred thirty-four dollars and eighty-five cents ($3,887,834.85).  (*Id.*; *see also* West Decl., Ex. C).

B.    Procedural History

On or about September 21, 2016, plaintiff commenced this action against the Dancy defendants, the Dean defendants, AKW and the defaulting defendants, alleging, *inter alia*, RICO

14

violations.  On December 1, 2016, plaintiff filed an amended complaint asserting claims seeking, *inter alia*, (1) damages (a) against Dancy and Hill, the Dean defendants and Williams for RICO violations (first, second and third causes of action, respectively), (b) against the Dancy defendants and Hill for breach of fiduciary duty (fourth cause of action), (c) against Dancy for conversion, tortious interference with contract, negligent misrepresentation and fraud (fifth, sixth, seventh and eighth causes of action, respectively), and (d) against the Dean defendants, AKW and Williams for breach of contract (ninth cause of action); (2) the imposition of a constructive trust over certain assets or property in the possession of Dancy, the Dean defendants and Williams (tenth cause of action); and (3) an order of replevin or attachment against all defendants (eleventh cause of action)[2].  With respect to plaintiff's RICO claims, plaintiff alleges, *inter alia*, that "defendants [sic] acts constituted a clear pattern of a close ended racketeering scheme specifically designed to defraud [it]."  (Am. Compl., ¶ 59).

With respect to plaintiff's RICO claim against the Dean defendants (second cause of action), the amended complaint alleges, *inter alia*, that the Dean defendants, (i) "agreed and conspired to violate 18 U.S.C. § 1962(c) with [Dancy and Hill] in multiple motor vehicle lease contracts with the view to defraud [plaintiff]," (Am. Compl., ¶ 148); (ii) "schemed" with Dancy

---

[2]  In plaintiff's memoranda of law in opposition to the Dean defendants' and AKW's motions to dismiss, plaintiff concedes that since the vehicles that purportedly remained in the Dean defendants' possession, *i.e.*, the 2015 Bentley Continental GT Convertible and the 2015 McLaren Spider, and in AKW's possession, *i.e.*, 2013 Land Rover/Range Rover Supercharged, were returned to it in November 2016, the replevin/attachment claim (eleventh cause of action) "has been rendered moot[]" as against those defendants.  (Plaintiff's Memorandum of Law in Opposition to the Dean Defendants' Motion to Dismiss ["Plf. Mem. (Dean)"] at 5, n. 5; Plaintiff's Memorandum of Law in Opposition to AKW's Motion to Dismiss ["Plf. Mem. (AKW)"] at 3, n. 5).  Accordingly, plaintiff's replevin/attachment claim (eleventh cause of action) is dismissed in its entirety with prejudice as against the Dean defendants and AKW.

and Hill "in order to promote a false impression that it [sic] was otherwise a righteous obligor that would act in good faith and fair dealing in connection with leasing and taking registration to the aforementioned motor vehicles[,]" (*id.*, ¶ 149); (iii) "intentionally provided a false impression that a bona fide lease was in place and that the subject vehicle was properly registered and possessed by themselves[]" by advancing monthly payments to plaintiff until July 2015, (*id.*, ¶ 150); (iv) conspired with Dancy and Hill "in order to dispossess the aforementioned 2014 Ferrari F 12 vehicle while carrying the ruse they were continuing to serve as bona fide lessee[,]" (*id.*, ¶ 151) (italics omitted); (v) "intentionally conspired with [Dancy] to assist in a fraudulent scheme the intention of which was to illegally transfer title to the 2014 Ferrari F 12 thereby permitting a subsequent illegal sale to a third-party and did complicitly undertake such predicate acts amidst a pattern of racketeering activity with an interstate enterprise[,]" (*id.*, ¶ 152) (italics omitted); (vi) "further conspired with [Dancy] to assist in a scheme the intention of which was to divert [plaintiff's] rights in accordance with a certain lease involving a 2014 Mercedes-Benz G Wagon 550[,]" (*id.*, ¶ 153) (italics omitted); (vii) "have been in default, since June, 2016 - with regards to . . . three [other] leased vehicles," *i.e.*, the 2013 Land Rover/Ranger Rover Supercharged, the 2015 Bentley Continental GT Convertible and the 2015 McLaren Spider, (*id.*, ¶ 155); (viii) have defied "all recourse activities" by plaintiff and "upon information and belief, having conspired further with [Dancy and Hill] - were schooled in matters to avoid repossession[,]" (*id.*, ¶ 156); and (ix) "conducted and participated in the conduct of the affairs of the enterprise, all while knowing of its intent and illegal operation of racketeering activity."  (*Id.*, ¶ 157).  Plaintiff claims to "have been injured in their [sic] business and property in that they [sic] have suffered [the following] financial loss:" "the minimal amount of" (i) five hundred eighty-four thousand

eighteen dollars ($584,018.00) with respect to the 2014 Ferrari F 12; (ii) thirty-one thousand nine hundred thirteen dollars and fifty cents ($31,913.50) with respect to the 2014 Mercedes-Benz G Wagon 550; (iii) four hundred eighty-one thousand one hundred forty-one dollars ($481,141.00) with respect to the 2015 McLaren Spider; (iv) two hundred ninety thousand one hundred ninety-nine dollars and fifty-two cents ($290,199.52) with respect to the 2015 Bentley Continental GT Convertible; and (v) seventy-two thousand five hundred seventy-two dollars and seventy-seven cents ($72,572.77) with respect to the 2013 Land Rover/Range Rover Supercharged.  (*Id.*, ¶ 158). Plaintiff seeks "treble damages, attorneys [sic] fees and other equitable relief" pursuant to 18 U.S.C. § 1964.  (*Id.*, ¶ 159).

With respect to plaintiff's breach of contract claim (ninth cause of action), the amended complaint alleges, *inter alia*, (i) that the Dean defendants and AKW entered into valid lease contracts with plaintiff, (Am. Compl., ¶ 199); (ii) that plaintiff "performed in accordance with said contracts by funding and in turn providing the delivery of the respective subject vehicles to the possession of those lessees[,]" (*id.*, ¶ 200); (iii) that the Dean defendants and AKW "failed to make all respective payments due under the aforementioned leases[,]" (*id.*, ¶ 201); (iv) that plaintiff "delivered multiple notices of default" to the Dean defendants and AKW, (*id.*, ¶ 202); and (v) that "despite repeated efforts to collect," the Dean defendants and AKW "have failed to cure their defaults or otherwise to compensate plaintiff in full."  (*Id.*, ¶ 203).  Plaintiff did not attach copies of the purported lease contracts to the pleadings, nor set forth any specific provisions thereof allegedly breached by the Dean defendants and AKW.  Plaintiff seeks damages "in the minimal sum of" two million dollars ($2,000,000.00).  (*Id.*, ¶ 204).

With respect to plaintiff's constructive trust claim (tenth cause of action), the amended

complaint alleges, *inter alia*, (i) "that by having entered into a contractual relationship with [plaintiff] a close degree of trust and reliance to use reasonable care to impart correct information was expected[,]" (Am. Compl., ¶ 205); (ii) "[t]hat the information imparted by [Dancy] was, in fact, false and misleading and was accordingly relied upon by [plaintiff]," (*id.*, ¶ 206); (iii) that plaintiff consequently "has been damaged[,]" (*id.*, ¶ 207); (iv) that plaintiff is "the equitable owner[] of the aforementioned motor vehicles along with other various assets of [Dancy] - including those vehicles remaining in possession of [the Dean defendants] . . . ," (*id.*, ¶ 208); (v) that "a constructive trust has been created when th[o]se parties fraudulently gained possession and control of [plaintiff's] property[,]" (*id.*, ¶ 209); (vi) that "defendants gained and/or maintained possession as a consequence of taking advantage of their confidential relationship[,]" (*id.*, ¶ 210); (vii) that "[b]y virtue of their actions," Dancy and the Dean defendants "have unjustly enriched themselves[,]" (*id.*, ¶ 211); and (viii) that "as [Dancy] may be holders [sic] in legal title to certain assets/property, and [the Dean defendants] . . . possess such assets - they may not, in good conscience, retain the beneficial interest to same[,]" and, thus, "equity should convert them." (*Id.*, ¶¶ 212-13).  Plaintiff seeks the imposition of a constructive trust "converting all surreptitiously conveyed titles and other assets for the benefit of [plaintiff]," in accordance with 18 U.S.C. § 1964.  (*Id.*, ¶ 214).

The Dean defendants and AKW now move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiff's claims against them in their entirety for failure to state a claim for relief.

II.     DISCUSSION

A.      Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937 (quoting *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare

19

recitals of the elements of a cause of action, supported by mere conclusory statements, do not

suffice." *Iqbal*, 556 U.S. at 678, 129 S. Ct. 1937.  "While legal conclusions can provide the

framework of a complaint, they must be supported by factual allegations." *Id.* at 679, 129 S. Ct.

1937.  "In keeping with these principles a court considering a motion to dismiss can choose to

begin by identifying pleadings that, because they are no more than conclusions, are not entitled to

the assumption of truth." *Id.*; *see also Ruston v. Town Bd. of Town of Skaneateles*, 610 F.3d 55,

59 (2d Cir. 2010).

　　　Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond

what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-1

(2d Cir. 2010); *accord Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret.

Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 729-30 (2d Cir. 2013).  "When there are

well-pleaded factual allegations, a court should assume their veracity and then determine whether

they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. 1937.

　　　In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure,

the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any

documents attached to the complaint as exhibits or incorporated by reference therein; to matters

of which judicial notice may be taken; or to documents upon the terms and effect of which the

complaint "relies heavily" and which are, thus, rendered "integral" to the complaint.  *Chambers

v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see also ASARCO LLC v. Goodwin*,

756 F.3d 191, 198 (2d Cir. 2014).  "[M]emoranda and supporting affidavits in opposition to a

motion to dismiss cannot be used to cure a defective complaint."  *Goodman v. Port Auth. of N.Y.

& N.J.*, 850 F. Supp. 2d 363, 380 (S.D.N.Y. 2012); *see also New York v. Mountain Tobacco Co.*,

55 F. Supp. 3d 301, 315 (E.D.N.Y. 2014) ("[O]n a motion to dismiss, . . a plaintiff may not

supplement a deficient pleading through additional facts contained in affidavits."); *Telebrands*

*Corp. v. Del Labs., Inc.*, 719 F. Supp. 2d 283, 290 (S.D.N.Y. 2010) ("[A]ffidavits are

inadmissible to cure a defect in the complaint on a motion to dismiss.")  Accordingly, the Court

has considered the DMV's "Finding Sheet," dated June 24, 2016, as integral to the amended

complaint, (*see* Am. Compl., ¶¶ 89-94), and takes judicial notice of the state court judgment, but

has not considered any of the other extrinsic evidence submitted by the parties in support of, or in

opposition to, defendant's motion to dismiss.


    B.    RICO Claims

    "RICO's private right of action is contained in 18 U.S.C. § 1964(c)," *Bridge v. Phoenix*

*Bond & Indem. Co.*, 553 U.S. 639, 647, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008), which

provides that, with an exception not relevant here, "[a]ny person injured in his business or

property by reason of a violation of section 1962 of this chapter may sue therefor in any

appropriate United States district court and shall recover threefold the damages he sustains and

the cost of the suit, including a reasonable attorney's fee[.]"  18 U.S.C. § 1964(c).

    The amended complaint alleges that the Dancy and Hill violated Section 1962(c) of

RICO, which provides, in relevant part, "It shall be unlawful for any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity . . . ."  18 U.S.C. § 1962(c).  "The term

'racketeering activity' is defined to include a host of so-called predicate acts," *Bridge*, 553 U.S.

at 647, 128 S. Ct. 2131, including "any act which is indictable under . . . section 1341 (relating to

mail fraud), section 1343 (relating to wire fraud) . . . sections 2312 and 2313 (relating to

interstate transportation of stolen motor vehicles) . . . [and] section 2321 (relating to trafficking in

certain motor vehicles or motor vehicle parts) . . . ."[3]  18 U.S.C. § 1961(1).  "The upshot is that

RICO provides a private right of action for treble damages to any person injured in his business

or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts

indictable as mail fraud[,]" *Bridge*, 553 U.S. at 647, 128 S. Ct. 2131, or as, *inter alia*, wire fraud,

interstate transportation of stolen motor vehicles or trafficking in certain motor vehicles or motor

---

[3]     Mail fraud occurs whenever a person, "having devised or intending to devise any scheme
or artifice to defraud, or for obtaining money or property by means of false or fraudulent
pretenses, representations, or promises," uses the mail "for the purpose of executing such scheme
or artifice or attempting so to do."  18 U.S.C. § 1341.  "The gravamen of the offense is the
scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the
mailing element, . . . even if the mailing itself contains no false information[.]" *Bridge*, 553 U.S.
at 647, 128 S. Ct. 2131 (quotations, alterations and citations omitted).

        Wire fraud occurs whenever a person, "having devised or intending to devise any scheme
or artifice to defraud, or for obtaining money or property by means of false or fraudulent
pretenses, representations, or promises, transmits or causes to be transmitted by means of wire,
radio, or television communication in interstate or foreign commerce, any writings, signs,
signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . ."  18 U.S.C.
§ 1343.

        Interstate transportation of stolen motor vehicles occurs whenever a person either (i)
"transports in interstate or foreign commerce a motor vehicle, . . . knowing the same to have been
stolen," 18 U.S.C. § 2312; or (ii) "receives, possesses, conceals, stores, barters, sells, or disposes
of any motor vehicle, . . . which has crossed a State or United States boundary after being stolen .
. . ." 18 U.S.C. § 2313(a).

        Trafficking in certain motor vehicles or motor vehicle parts occurs whenever a person
"buys, receives, possesses, or obtains control of, with intent to sell or otherwise dispose of, a
motor vehicle or motor vehicle part, knowing that an identification number for such motor
vehicle or part has been removed, obliterated, tampered with, or altered . . . ." 18 U.S.C. §
2321(a).

vehicle parts.  *See Reich v. Lopez*, — F.3d —, 2017 WL 2293546, at * 2 (2d Cir. May 26, 2017) ("RICO imposes liability on individuals working for an 'enterprise' that commits certain predicate crimes that amount to a 'pattern of racketeering activity.'" (quoting 18 U.S.C. §§ 1962, 1964)).  Thus, in order to state a claim for a violation of Section 1962(c) of RICO, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern[] (4) of racketeering activity[,]" *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985) (footnote omitted); and (5) that "he has been injured in his business or property by the conduct constituting the violation."  *Id.*

The amended complaint alleges that the Dean defendants violated Section 1962(d) of RICO, which provides, "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section."  18 U.S.C. § 1962(d).  In order "to establish a RICO conspiracy, a plaintiff must show a conspiracy to commit a substantive RICO violation . . . ."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008); *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 487 (2d Cir. 2014) ("To establish a violation of § 1962(d), a plaintiff must show that the defendant agreed with at least one other entity to commit a substantive RICO offense."); *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 244 (2d Cir. 1999) ("To establish the existence of a RICO conspiracy, a plaintiff must prove the existence of an agreement to violate RICO's substantive provisions." (quotations and citation omitted)).  "A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."  *Salinas v. United States*, 522 U.S. 52, 65, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997); *accord Ocasio v. United States*, — U.S. —, 136 S. Ct.

23

1423, 1429, 194 L. Ed. 2d 520 (2016).  "In the civil context, a plaintiff must allege that the

defendant 'knew about and agreed to facilitate the scheme.'" *Baisch v. Gallina*, 346 F.3d 366,

377 (2d Cir. 2003) (quoting *Salinas*, 522 U.S. at 66, 118 S. Ct. 469); *see also Ocasio*, — U.S. —,

136 S Ct. at 1429 ("Although conspirators must pursue the same criminal objective, a conspirator

need not agree to commit or facilitate each and every part of the substantive offense. . . . A

defendant must merely reach an agreement with the specific intent that the underling crime *be*

*committed* by some member of the conspiracy."  (emphasis in original; quotations, alterations

and citations omitted)).  "Plaintiffs are not obligated to plead that [a defendant] agreed to commit

any particular predicate act. . . . Instead, they are required to plead facts demonstrating that [the

defendant] agreed to join the alleged RICO enterprise with knowledge that predicate acts would

be committed by members of that enterprise."  *Martin Hilti Family Trust v. Knoedler Gallery,*

*LLC*, 137 F. Supp. 3d 430, 481 (S.D.N.Y. 2015); *see also Crabhouse of Douglaston Inc. v.*

*Newsday Inc.*, 801 F. Supp. 2d 64, 89 (E.D.N.Y. 2011) ("A RICO conspiracy claim requires an

allegation that the defendant agreed to participate in a charged enterprise's affairs through a

pattern of racketeering, not a conspiracy to commit predicate acts."  (quotations and citation

omitted)).

 Although allegations of conspiracy are "properly measured under the . . . liberal pleading

requirements of Rule 8(a) [of the Federal Rules of Civil Procedure]," not the particularity

requirements of Fed. R. Civ. P. 9(b), the complaint must still "allege some factual basis for a

finding of a conscious agreement among the defendants."  *Hecht v. Commerce Clearing House,*

*Inc.*, 897 F.2d 21, 26 n. 4 (2d Cir. 1990); *accord Elsevier Inc. v. W.H.P.R., Inc.*, 692 F. Supp. 2d

297, 313 (S.D.N.Y. 2010).  Conclusory allegations of an agreement are insufficient to state a

plausible RICO conspiracy claim. *See, e.g. Kashelkar v. Rubin & Rothman*, 97 F. Supp. 2d 383, 394 (S.D.N.Y. 2000), *aff'd* 1 F. App'x 7 (2d Cir. Jan. 2, 2001); *4 K&D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d 525, 545 (S.D.N.Y. 2014); *Davis v. Yeroushalmi*, 985 F. Supp. 2d 349, 362 (E.D.N.Y. 2013).

Since the amended complaint is devoid of any factual allegations from which it may reasonably be inferred that the Dean defendants agreed to join or participate in the alleged RICO enterprise with knowledge that predicate acts would be committed by the Dancy defendants, Hill, or any other alleged member of that enterprise, it fails to state a plausible RICO conspiracy claim against the Dean defendants. *See, e.g. Foster v. 2001 Real Estate*, No. 14-cv-9434, 2015 WL 7587360, at * 6 (S.D.N.Y. Nov. 24, 2015) ("Although the Complaint contains numerous allegations that the Defendants 'confederated,' 'conspired, or 'agreed' to commit the predicate acts, . . . such conclusory statements, without more, are insufficient to sustain a RICO conspiracy claim."); *Nasik Breeding & Research Farm Ltd. v. Merck & Co., Inc.*, 165 F. Supp. 2d 514, 541 (S.D.N.Y. 2001) (dismissing the plaintiff's Section 1962(d) claim because, *inter alia*, the pleadings "fail[ed] to provide specific allegations supporting an inference that each defendant knowingly agreed to participate in a conspiracy" and were "devoid of factual assertions concerning the existence and nature of an agreement . . . .")  Accordingly, the branch of the Dean defendants' motion seeking dismissal of plaintiff's RICO conspiracy claim against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiff's RICO conspiracy claim against the Dean defendants (second cause of action) is dismissed in its entirety

with prejudice for failure to state a claim for relief.[4]


C.    Breach of Contract Claims

"Under New York state law, a breach of contract claim must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (quotations and citation omitted); *see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) ("To make out a viable claim for breach of contract a complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."(quotations and citation omitted)). "Regarding the first element, to plead the existence of an agreement, a complaint must allege the essential terms of the parties' purported contract in nonconclusory language, including the specific provisions of the contract upon which liability is predicated." *Childers v. New York & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014) (quotations and citation omitted); *see also Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 468 (S.D.N.Y. 2016) ( "A breach of contract claim will be dismissed[] . . . as being too vague and indefinite, where the plaintiff fails to allege, in nonconclusory fashion, the essential terms of the parties' purported contract, including the specific provisions of the contract upon which liability is predicated." (quotations and citation omitted)); *USHA Holdings, LLC v. Franchise India Holdings Ltd.*, 11 F. Supp. 3d 244, 276 (E.D.N.Y. 2014) (accord). In this

---

[4]  In light of this determination, it is unnecessary to consider the Dean defendants' remaining contentions seeking dismissal of the RICO conspiracy claim against them.

Circuit, "plaintiff must at least allege which agreement was breached and the relevant breached provisions of that contract." *Negrete*, 187 F. Supp. 3d at 468; *see also Mariah Re Ltd. v. American Family Mut. Ins. Co.*, 52 F. Supp. 3d 601, 611 (S.D.N.Y. 2014), *aff'd* 607 F. App'x 123 (2d Cir. June 30, 2015) ("An essential requirement to stating [a claim for breach of contract] is alleging a specific provision that was breached." (quotations and citation omitted)); *Childers*, 36 F. Supp. 3d at 312 ("A complaint fails to sufficiently plead the existence of a contract if it does not provide factual allegations regarding, *inter alia*, the formation of the contract, the date it took place, and the contract's major terms.")

Since the amended complaint fails to plead the essential terms of the alleged agreements between plaintiff and the Dean defendants, or plaintiff and AKW, and which provisions, if any, of those purported agreements were breached by those defendants, it fails to state a plausible breach of contract claim against the Dean defendants and AKW. Accordingly, the branches of the Dean defendants' and AKW's motions seeking dismissal of plaintiff's breach of contract claim against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiff's breach of contract claim against the Dean defendants and AKW (ninth cause of action) is dismissed in its entirety with prejudice for failure to state a claim for relief.


D.    Constructive Trust Claim

"A constructive trust is an equitable remedy, necessarily flexible to accomplish its purpose[,]" *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999), which "is to prevent unjust enrichment[.]" *Id.*; *see also Simonds v. Simonds*, 45 N.Y.2d 233, 241-42, 408 N.Y.S.2d 359, 380 N.E.2d 189 (N.Y. 1978) ("[A] constructive trust is an equitable remedy. . . . [T]he Court

27

. . . reserves freedom to apply this remedy to whatever knavery human ingenuity can invent . . . .

[T]he purpose of the constructive trust is prevention of unjust enrichment." (quotations, alterations and citations omitted)).  "What is necessary is that the court identify a party who is holding property under such circumstances that in equity and good conscience he ought not to retain it."  *Counihan*, 194 F.3d at 361 (quotations and citation omitted); *see also Simonds*, 45 N.Y.2d at 241, 408 N.Y.S.2d 359 ("[A] constructive trust is the formula through which the conscience of equity finds expression.  When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee[.]" (quotations and citation omitted)).  "Whether a party is unjustly enriched is a legal conclusion reached through the application of principles of equity." *Counihan*, 194 F.3d at 361; *see also Simonds*, 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359 ("A court of equity in decreeing a constructive trust is bound by no unyielding formula.  The equity of the transaction must shape the measure of relief[.]" (quotations and citation omitted)).  "Unjust enrichment results when a person retains a benefit which, under the circumstances of the transfer and considering the relationship of the parties, it would be inequitable to retain[,]" regardless of whether the party enriched committed any wrongful act.  *Counihan*, 194 F.3d at 361; *see also Simonds*, 45 N.Y.2d at 242, 408 N.Y.S.2d 359 ("Unjust enrichment . . . does not require the performance of any wrongful act by the one enriched . . . . Innocent parties may frequently be unjustly enriched.  What is required, generally, is that a party hold property under such circumstances that in equity and good conscience he ought not to retain it." (quotations and citation omitted)).

Generally, "[t]he elements of a constructive trust are (1) a fiduciary or confidential

relationship; (2) an express or implied promise; (3) a transfer in reliance on the promise; and (4) unjust enrichment." *Kaprov v. Stalinsky*, 145 A.D.3d 869, 871, 44 N.Y.S.3d 123 (N.Y. App. Div. 2016) (quotations and citation omitted); *accord Ning Xiang Liu v. Al Ming Chen*, 133 A.D.3d 644, 644-45, 19 N.Y.S.3d 565 (N.Y. App. Div. 2015).  However, "these elements serve only as a guideline, [and] a constructive trust may still be imposed even if all of the elements are not established." *Kaprov*, 145 A.D.3d at 871, 44 N.Y.S.3d 123 (quotations and citation omitted); *see also Ning Xiang Liu*, 133 A.D.3d at 645, 19 N.Y.S.3d 565 (holding that while the four (4) elements of a constructive trust claim may be "useful in many cases, the constructive trust doctrine is not rigidly limited . . . [and] is given broad scope to respond to all human implications of a transaction in order to give expression to the conscience of equity and to satisfy the demands of justice[.]" (quotations, alterations and citations omitted)).  Thus, even absent a confidential or fiduciary relationship, a constructive trust may be imposed in the interests of justice in order to prevent unjust enrichment.  *See Haberberg v. G.F.A. Advanced Sys. Ltd.*, 137 A.D.3d 481, 483, 28 N.Y.S.3d 12 (N.Y. App. Div. 2016).

Plaintiff does not address the branch of the Dean defendants' motion seeking dismissal of its constructive trust claim against them.  Moreover, it is clear from the allegations in the amended complaint and plaintiff's opposition to the Dean defendants' motion, that the Dean defendants are not currently holding any of plaintiff's property on which a constructive trust can be imposed.  Accordingly, the branch of the Dean defendants' motion seeking dismissal of plaintiff's constructive trust claim against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and plaintiff's constructive trust claim (tenth cause of action) against the Dean defendants is dismissed in its entirety with prejudice for failure to state a claim for

29

relief.

III.     CONCLUSION

For the reasons set forth above, the Dean defendants' and AKW's motions to dismiss plaintiff's claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure are granted to the extent set forth herein and plaintiff's claims against the Dean defendants and AKW are dismissed in their entirety with prejudice for failure to state a claim for relief.  There being no just reason for delay, the Clerk of the Court shall enter final judgment in favor of the Dean defendants and AKW on all of plaintiff's claims against them and terminate them from this case.

SO ORDERED.

_____
        /s/
Sandra J. Feuerstein
United States District Judge

Dated: June 19, 2017
        Central Islip, New York